UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

                                    Chapter 13

John Ricci-Breen and Margaret Ricci-Breen,    Case No. 14-22798 (RDD)

                       Debtors.
-------------------------------------------------------------x

**POST-TRIAL MEMORANDUM OF DECISION ON DEBTORS' MOTION FOR AN ORDER
VOIDING SECOND MORTGAGE LIEN OF PNC BANK, NATIONAL ASSOCIATION UNDER 11 U.S.C. § 1322**

Appearances:  BRONSON LAW OFFICES, P.C., by H. Bruce Bronson, Esq., for the Debtors

        TUCKER ARENSBERG, P.C., by Jordan S. Blask, Esq., for PNC Bank, National Association

HON. ROBERT D. DRAIN, United States Bankruptcy Judge

      By motion, dated October 27, 2014 (the "Motion"), the debtors herein (the "Debtors") sought an order voiding the second mortgage lien of PNC Bank, National Association ("PNC") on their principal residence, located at 81 Poplar Rd., Briarcliff Manor, NY 10510 (the "Property"), pursuant to 11 U.S.C. §§ 506(a) and 1322(b) as applied by Pond v. Farm Specialist Realty (In re Pond), 252 F.3d 122 (2d Cir. 2001).

      The right to such relief depends on the Court finding that "there is not even one dollar of value in the Property to support the lien which the Debtor[s] seek to avoid." In re Lepage, 2011 Bankr. LEXIS 1842, at *11-12 (Bankr. E.D.N.Y. May 18, 2011)  (internal quotations and citations omitted).  This is because, as held by the Second Circuit, the Bankruptcy Code's exception in 11 U.S.C. § 1322(b)(2)  to a chapter 13 plan's ability to modify the rights of the holder of a claim secured only by a security interest in real property that is the debtor's principal residence "protects a creditor's rights in a mortgage lien only where the debtor's residence retains enough value -- after accounting for other encumbrances that have priority over the lien -- so that the lien is at least partially secured under [11 U.S.C. § 506(a)]." In re Pond, 252 F.2d at 126.  If there is no such value, the chapter 13 plan may modify the creditor's rights

1

under 11 U.S.C. § 1322(b), id.,[1] and treat the (in fact) wholly unsecured claim like other unsecured claims over the creditor's objection under 11 U.S.C. § 1325(b) (provided, of course, that the debtor (i) complies with the confirmation requirements of 11 U.S.C. § 1325(a)(1)-(4) and (6)-(9) (§ 1325(a)(5) being inapplicable because it applies only to (in fact) secured claims), and (ii) performs the confirmed plan that has modified the claim and therefore is binding on the creditor.[2]

Here, PNC objected to the Debtors' assertion, supported by an appraisal, that there was no collateral value in the Property to secure PNC's junior mortgage debt and submitted its own appraisal showing that there is at least some value in the Property in excess of the senior mortgage debt. The Court therefore held an evidentiary hearing on April 14, 2015 (the "Hearing") on the value of the Property. This Memorandum of Decision sets forth the Court's reasons for concluding, upon the record of the Hearing and after considering post-hearing submissions and weighing the evidence, that the Motion should be granted and PNC's junior mortgage lien treated as void under the Debtors' chapter 13 plan, subject to PNC's rights under 11 U.S.C. § 363(k) and the lien's reinstatement if this case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code before the Debtors complete

---

[1] Subject to the other requirements of § 1322 of the Bankruptcy Code, a chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims," 11 U.S.C. § 1322(b)(2), "provide for the payment of all or part of a claim against the debtor from property of the estate or property of the debtor," 11 U.S.C. § 1322(b)(8), and "provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or any other entity." 11 U.S.C. § 1322(b)(9).

[2] The operation of these provisions under a chapter 13 plan providing for payment of allowed claims from the Debtors' income over time, as opposed to in a chapter 7 case where allowed claims are paid with the estate's liquidation proceeds according to chapter 7's priority scheme, distinguishes the chapter 13 lien-stripping analysis from the analysis in the chapter 7 context of Bank of Am., N.A. v. Caulkett, 135 S. Ct. 1995 (2015), and Dewsnup v. Timm, 502 U.S. 410 (1992), which necessarily applied only § 506 of the Bankruptcy Code because, in a chapter 7 liquidation, there is no provision comparable to § 1322(b) permitting the modification of creditors' rights under a plan. See, e.g., In re Davis, 716 F.3d 331, 338 (4th Cir. 2013) ("While Dewsnup admittedly requires that section 506 operate in tandem with another statutory provision to effectuate lien-stripping, section 506 always operated in tandem with section 1322(b) to strip liens in Chapter 13 cases"); In re Scantling, 754 F.3d 1323, 1329-30 (11th Cir. 2014); In re Wapshare, 492 B.R. 211, 215, 217 (Bankr. S.D.N.Y. 2013) (noting that if the plan is not confirmed or the case is dismissed or converted to chapter 7 before the plan's performance, the underwater lien will be restored); In re Wong, 488 B.R. 537, 546 (Bankr. E.D.N.Y. 2013) ("Chapter 13 provides a separate mechanism for lien avoidance [than Section 506(d) of the Bankruptcy Code, the only mechanism arguably available for such use in a chapter 7 case], through Sections 1322 and 1325.").

2

their chapter 13 plan. There is no collateral value supporting PNC's junior lien; accordingly, its wholly unsecured claim can be modified under 11 U.S.C. § 1322(b)

### Jurisdiction

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), which it can decide by final order as a core proceeding under 28 U.S.C. § 157(b)(2)(B), (K) and (L).

### Discussion

The parties agree that the Property is encumbered by a first mortgage securing Bank of America N.A.'s claim of $429,736.93. The Debtors do not identify any other encumbrances on the Property senior to PNC's second mortgage, and thus PNC contends that it need show only that the Property has a value in excess of $429,736.93 to satisfy the test of In re Pond, 252 F.3d at 126. To do so, it submits its own $440,000 appraisal and argues that the Debtors' $400,000 valuation is too low. In re Casas, 2014 Bankr. LEXIS 4515, at *20-21 (Bankr. N.D. Cal. Sept. 28, 2014) ("Initially the Debtors bear the burden of overcoming any presumption that the value of the property stated in Creditor's proof of claim is the correct value. Once the Debtors meet this burden, it then becomes the Creditor's burden of persuasion to demonstrate the value of the collateral by a preponderance of the evidence.") (internal citations omitted); In re Lepage, 2011 Bankr. LEXIS 1842, at *12 ("Once the Debtors' burden has been met, [the junior lienholder] must submit sufficient evidence to overcome the Debtors' valuation."); In re Karakas, 2007 Bankr. LEXIS 1578, at *19-20 (Bankr. N.D.N.Y. May 3, 2007) (same).[3]

---

[3] One court has stated that "the debtor's burden will naturally be higher, in that the Court will scrutinize the evidence more carefully, when: (1) it appears that there is equity available to support the mortgage that is to be avoided at the time it was executed; (2) the alleged value deficiency may have been created in part because of a debtor's failure to make payments on superior mortgages, or to pay obligations such as real estate taxes and water bills which become a superior lien on the property; and (3) the alleged value deficiency is not substantial." In re Dzeindziel, 295 B.R. 184, 188 (Bankr. W.D.N.Y. 2003). However, PNC has not raised the first two such circumstances here (to the extent they are relevant, which the Court doubts at least as to the first circumstance) and, as importantly, under the rationale of In re Pond none warrant altering the burden of proof, which may explain why no other court appears to have followed Dzeindziel's "additional scrutiny" approach. If a debtor has manipulated the value of the property or the amount of the senior mortgage debt in order to prevail under In re Pond, his or her chapter 13 plan will not be confirmed as not having been proposed in good faith under 11 U.S.C. §

3

The Debtors contend, however, that in addition to subtracting the senior mortgage debt from the value of the Property, they are entitled to subtract the Property's reasonably projected selling costs, at least a customary broker's fee, before the Court determines whether there is any remaining value to support PNC's secured claim. The outcome of this legal dispute would be dispositive here, because it is clear, based on the $440,000 value ascribed to the Property by PNC's appraiser, that even if a broker charged only a 2.5 percent commission there would be no remaining collateral value to provide PNC with any recovery, and, in the Court's experience based on the frequent review of residential broker retention agreements under 11 U.S.C. §§ 327(a) and 328(a), the average broker commission for the Property would be higher than 2.5 percent, ranging from 4 to 6 percent.[4]

For purposes of Pond's lien-stripping analysis, is there a meaningful legal difference between deducting Bank of America, N.A.'s first lien debt and deducting a reasonable broker's commission from the value of the Property before determining whether there is any collateral value securing PNC's junior lien? Apparently no one raised the issue to the Pond court; however, in refuting the argument that it should value the lender's *in rem* rights under New York law over and above the value of the collateral, the Pond court stated,

> This argument has been foreclosed by the Supreme Court, which has explained that 'subsection (a) of § 506 provides that a claim is secured only to the extent of the *value of the property* on which the lien is fixed.' United States v. Ron Pair Enters., Inc., 489 U.S. 235, 239, 103 L. Ed. 2d 290, 109 S. Ct. 1026 (1989) (emphasis added); see also Associates Commercial Corp. v. Rash, 520 U.S. 953, 961, 138 L. Ed. 2d 148, 117 S. Ct. 1879 (1997) ('The first sentence of § 506(a), in its entirety, tells us that . . . the secured portion of a claim is limited to the value of the collateral.'). Accordingly, to determine whether a lien is 'secured' under Section 506(a), a court must examine the value of the collateral underlying a lien, not the value of the lien itself.'

---

1325(a)(3); otherwise, evidence is evidence: there is no reason to evaluate it with an anti-debtor, or pro-junior mortgagee bias.

[4] PNC's appraiser, who is also a real estate agent, confirmed this finding. Hearing Transcript dated April 14, 2015 ("Tr.") at 25.

Id. To drive the point home, the court continued, "The value of the lien could differ from the value of the collateral underlying that lien for a variety of reasons, such as the state-law rights that attach to the lien but not to the collateral, *or the costs associated with collecting on the lien*." Id. n. 5 (emphasis added). Thus it would appear that, under In re Pond, one should not deduct the lender's hypothetical collection or sales costs, such as a broker's commission.

This conclusion is supported by Associates Commercial Corp. v. Rash, 520 U.S. 953 (1997), cited by the Pond court, which held that when valuing collateral under 11 U.S.C. § 506(a) for purposes of cramming down a secured creditor under 11 U.S.C. § 1325(a)(5), the first sentence of § 506(a), which refers to a claim being secured "*to the extent of the value of such creditor's interest* in the estate's interest in such property" (which the lower court had construed as requiring a valuation from the *creditor's* perspective, including the deduction of hypothetical selling costs), should not control. Id. at 960-61. Instead, the analysis should be directed by the second sentence of § 506(a), which requires such value be determined "in light of the purpose of the valuation and of *the proposed disposition or use of such property*." Id. at 961-62. Therefore, where, as is the case here, the court is valuing collateral in a context where the debtor is proposing to keep the collateral, the focus should be on the value of the property in the debtor's possession, that is, the replacement value to the debtor of property of the same type and condition. Id. at 962-63.[5] When the debtor is retaining the collateral under the plan, therefore, selling costs, unlike a senior mortgage, remain only hypothetical and should not be deducted. Id.

---

[5] The Court clarified its holding by noting that by "replacement" value it meant value from the debtor's present perspective; thus, it would not include, for example, aspects of the retail value of a comparable property attributable to features such as warranties and reconditioning that would not apply to the actual property proposed to be retained under the debtor's chapter 13 plan. Id. at 966 n.6. Nor does it appear that the Court's use of the term "replacement value" should be equated with the "cost approach" valuation methodology, which is based on the cost of using new materials to substitute for the property at issue.

5

This clearly provides a windfall to the junior lienholder over what it would recover if the debtor abandoned the collateral or it were liquidated in foreclosure; indeed, Rash not only reversed the Fifth Circuit's award of the going concern surplus to the debtor but also declined to adopt the approach of the Second and Seventh Circuits, which split the savings between the creditor and the debtor resulting from not liquidating the collateral.  Id. at 959, 964-65.[6]

Apparently no post-Rash decision has deducted selling costs in addition to senior lien debt in the lien-stripping context; to the contrary, courts addressing the issue after Rash have consistently held that, because the debtor is retaining the house, liquidation or selling costs should not be deducted.  See e.g., In re Strever, 468 B.R. 776, 780-81 (Bankr. D. S.C. 2012); In re Yildiz, 2011 Bankr. LEXIS 4996, at *4 (Bankr. E.D. Va. Dec. 19, 2011); In re Serda, 395 B.R. 450, 456 (Bankr. E.D. Cal. 2008); In re Smith, 262 B.R. 594, 599-600 (Bankr. E.D.N.Y. 2001); see also In re Relyea 2003 Bankr. LEXIS 2254, at *7-8 (Bankr. N.D.N.Y. Apr. 26, 2003) (same analysis applied to stripping off judicial lien under 11 U.S.C. § 522(f)).

The proper question, then, is whether the fair market value of the Property exceeds $429,736.93, the amount of the first mortgage debt.

To support their contention that the Property is worth less than such sum, the Debtors offered two witnesses:  Joshua Gluckman, who prepared an fair market appraisal of the Property as of April 18, 2014 (the "Gluckman App.") in the amount of $400,000,[7] and Ed Hiney, who, consistent with the Court's pre-hearing order, submitted a declaration, dated April 6, 2015 ("Hiney Decl.") serving as Mr. Hiney's direct testimony, which consists of a cost estimate of basic repairs and the completion of partially finished renovations to the Property.

---

[6] Rash's approach also does no favors to senior lienholders, who would often benefit from junior lienholders' secured claims in bankruptcy cases reflecting the reality of what would occur in out-of-bankruptcy enforcement proceedings.

[7] In accordance with the Court's pre-hearing instructions, by declaration dated April 6, 2015, Mr. Gluckman affirmed that the Gluckman App. could be used as his direct testimony for the Hearing.  (The Debtors had obtained a second appraisal of the Property by Dennis Federico as of March 24, 2014 in the amount of $390,000; however, by letter dated April 5, 2015 they withdrew this appraisal, and Mr. Federico was not a witness at the Hearing.)

In response, PNC introduced a fair market appraisal of the Property by Shraga Victor Breuer as of July 20, 2014 in the amount of $440,000 (the "Breuer App.").[8]

Both appraisers were cross-examined; PNC declined to cross-examine Mr. Hiney, although the Court asked him some questions.

At the outset, it is worth noting how narrow this valuation dispute is. Mr. Breuer's appraisal exceeds the required $429,736.93 amount by only $10,263.07, or by only about 2.39 percent more than the target. Mr. Gluckman's appraisal is only about 6.9 percent less than the target. Though Mr. Breuer testified that such appraisals only derive one opinion of value, not a range, he also noted that a 10 percent difference in opinion is "not considered in terms of appraisal a huge discrepancy." Tr. at 29.

It is also worth noting that the parties have sidestepped an issue that has conflicted courts in other lien-stripping cases: the proper date of the Property's valuation.[9] The dates of their respective appraisals are relatively close to each other (and also bracket the June 5, 2014 chapter 13 petition date), and neither party argued that a different appraisal date would materially change his analysis. The strongest statement to the contrary was Mr. Breuer's testimony that, generally speaking, home prices in

---

[8] By declaration dated April 6, 2015, Mr. Breuer affirmed that this appraisal could be used as his direct testimony at the Hearing.

[9] Courts have taken at least three different positions on the proper valuation date for lien-stripping determinations: (1) the bankruptcy petition date, primarily because of the importance of that date to fixing certain claims under 11 U.S.C. §§ 502, 506 and 507, as well as because it is a clear and often significant demarcation of creditor rights generally in bankruptcy cases, see, e.g., In re Putnam, 519 B.R. 491, 498-99 (Bankr. N.D. Miss. 2014); In re Gilpin, 479 B.R. 905, 908 (Bankr. M.D. Fla. 2011); (2) a date chosen in the exercise of the court's discretion in light of the particular facts, including, as here, that the parties have not identified a practical effect in using a different date, see, e.g., In re Wright, 460 B.R. 581, 585 (Bankr. E.D.N.Y. 2011), or in light of various equitable considerations or policy concerns, In re Aubain, 296 B.R. 624, 636-37 (Bankr. E.D.N.Y. 2003); In re Wood, 190 B.R. 788, 794-95 (Bankr. M.D. Pa. 1996); and (3) at or near the chapter 13 plan's confirmation date, primarily because the lien-stripping analysis is premised on the chapter 13 plan's ability to restructure wholly unsecured claims under 11 U.S.C. § 1322(b)(2). See, e.g., In re Backenstoes, 2012 Bankr. LEXIS 4733, at *34-37 (Bankr. M.D. Pa. October 8, 2012); In re Roach, 2010 Bankr. LEXIS 159, at *12-15 (Bankr. W.D. Mo. Jan. 15, 2010); and 8 COLLIER ON BANKRUPTCY, ¶ 1325.06[3][b][iv] (Alan N. Resnick & Henry J. Sommer, eds. 16th ed. 2015); see also in re Cahill, 503 B.R. 535, 540-42 (Bankr. D. N.H. 2013) (taking flexible approach but noting that the confirmation date would generally be the proper valuation date), based on an analysis with which this Court agrees.

7

the Property's area showed a "slow but steady increase" over time, Tr. at 29;[10] however, neither Mr.

Breuer nor PNC argued that applying a later valuation date would alter the valuation of the Property.

The parties also agreed on the "comparable sales approach" as the proper valuation method for

the Property, which both appraisers primarily relied on.[11]   This method has been described as follows:

> Under the comparable sales approach the appraiser researches the debtor's market
> place to find several recent sales of similar properties.  Since every piece of property is
> unique, the appraiser then adjusts the actual sales prices of the comparables to account
> for both positive and negative differences between the comparables and the subject
> property.  This process generates a range of adjusted sales and prices, within which the
> appraiser places the debtor's property in an attempt to ascertain what the debtor's
> property would actually sell for in its own market.

In re Lepage, 2011 Bankr. LEXIS 1842, at *12, quoting In re Maple, 2008 Bankr. LEXIS 2562, at *6-7

(Bankr. D. Vt. Aug. 8, 2008).  The comparable sales approach not only is a commonly accepted means to

derive market value, In re Lepage, 2011 Bankr. LEXIS 1842, at *12, but also is the most reliable means to

value a residence short of selling it.  In re Aziz, 2011 Bankr. LEXIS 4490, at *6-7 (Bankr. S.D.N.Y. Nov. 18,

2011); In re Yildiz, 2011 Bankr. LEXIS 4996, at *7-8;  see also United States v. Trout, 386 F.2d 216, 222-23

(5th Cir. 1967)  ("[T]he courts have said repeatedly that comparable sales -- sales from a willing seller to a

willing buyer of similar property in the vicinity at or about the same time -- constitute the best evidence

of market value.").

It is clear that valuations of real property are not mathematical exercises, but, rather, involve

judgments about the market, the comparables and the specific property at issue.  In re Aziz, 2011 Bankr.

---

[10] Mr. Gluckman opined that the market for similar homes in the area had been stable for the last twelve months. Gluckman App. at 4.

[11] Mr. Gluckman also used a replacement cost approach, Gluckman App. at 5, but he acknowledged that it was inferior to the comparable sales approach. Id.  Mr. Breuer considered using both the income and replacement cost approaches in addition to the comparable sales approach but did not use the income approach because of the lack of gross rental information, and he stated that "the value derived from the market data [or comparable sale] approach is the most indicative value for this report." Breuer App. at 3. The Court accorded no weight to either appraiser's replacement cost valuation, especially in light of the marked difference between the physical condition of the Property and new construction.  See In re Yildiz, 2011 Bankr. LEXIS 4996, at *6-7 (rejecting cost approach as routinely disregarded in this context because it rarely provides an accurate measure of the fair market value of real estate).

8

LEXIS 4490, at *12; in re Lepage, 2011 Bankr. LEXIS 1842, at *10-11.  It being axiomatic that real property is unique, there is a fair amount of subjectivity inherent in both selecting and adjusting the price of "comparable" sold properties to derive a value for the property at issue.  Id.; In re Wright, 460 B.R. at 584.  The appraiser does not even simply average the adjusted prices of the chosen comparables, but, rather, weights them in light of his or her overall assessment, reconciling to the most similar comparable(s).  Tr. at 12-13.  In evaluating the resulting analysis, a court should of course consider the experience, accuracy and general credibility of the valuation witnesses.  In re Lapage, 2011 Bankr. 1842, at *12; see also In re Aziz, 2011 Bankr. LEXIS 4490, at *12-14 (taking into account several inaccuracies in debtor's appraisal).  Moreover, the court is not limited to selecting one or the other appraisal; recognizing the inherent elements of subjectivity in the appraisal process, "[a] court is not bound by values determined by appraisals [and] may form its own opinion as the value of the subject property."  In re Karakas, 2007 Bankr. LEXIS 1578, at *17.

Here, both appraisers were equally experienced in valuing houses in the area of the Property. Mr. Breuer was certified in New York as a real estate general appraiser in or around 1993 and conducts about 400 appraisals annually, 90 percent of which are of houses in Westchester County.  Tr. at 21-22, 24.  Mr. Gluckman also is a New York certified real estate general appraiser, Gluckman App. at 9, and conducts between 300 and 400 appraisals annually, primarily in Westchester County.  Tr. at 5-6.  Both understood the independence requirements of a certified real estate appraisal, id. at 5-6, 8 (Gluckman), 22-23 (Breuer).  Both applied the Uniform Standards of Professional Practice adopted by the Appraisal Standards Board of The Appraisal Foundation in place when the respective appraisals were prepared, Gluckman App. at 9; Breuer App. at 7, and both were generally credible in doing so.

Both appraisers visited and inspected the Property.  Tr. at 7 (Gluckman), 24-25 (Breuer), as well as visited properties in the area of the Property that they thought might serve as comparables, id. at 7-8

9

(Gluckman); Breuer App. at 5, and properly applied the comparable sales approach.  Tr. at 10, 12-13 (Gluckman), 26-27 (Breuer).

The appraisals differ over two fundamental issues.  First, according to Mr. Breuer, the Property is in the Briarcliff Manor school district, which is where all of his comparables are located, Tr. at 33, but three of Mr. Gluckman's comparables, including the two that Mr. Gluckman identified most reliably reflect the Property's value (comparables 1 and 5), id. at 13, are in the Ossining school district.  Id. at 34.  Mr. Gluckman did not identify the school districts where his comparables were located.[12]  Although he testified that the location of a property in a particular school district matters for valuation purposes, id. at 14, Mr. Gluckman testified that the Briarcliff Manor and Ossining school districts were similar, or not so different as to cause him to further adjust his valuation.  Id.  Mr. Breuer disagreed, testifying that "Briarcliff Manor is considered a far superior school district than Ossining is," Id. at 35, which accordingly, he believed required another upward adjustment by Mr. Gluckman to any comparable located in the Ossining school district.  Id. at 36-38.

The Court agrees with both appraisers that the location of a property in a particular school district can affect its market price if the school districts materially differ in quality, even for properties, such as Mr. Gluckman's comparables, which are in close proximity.[13]  Neither appraiser, however, provided any evidence for his conclusion regarding the respective merits of the Briarcliff and Ossining school districts, with the exception that Mr. Breuer pointed out that the pre-adjusted sale prices of Mr. Gluckman's Ossining school district comparables were approximately $80,000 less than the pre-adjusted sale prices of Mr. Gluckman's Briarcliff Manor school district comparables.  Id. at 38.  In almost the same breath, however, Mr. Breuer stated that an adjustment based on school district "is not that simple."  Id.

---

[12] The Court has no reason to doubt Mr. Breuer's testimony about the location of the Property and the location of the appraisals' comprables in the Briarcliff Manor and Ossining school districts.

[13] Mr. Gluckman's comparable 1, for example, is located less than half a mile from the Property on the same street. Gluckman App. at 5.

10

He also acknowledged that he had come up with neither an adjustment for the school district distinction that he would apply to Mr. Gluckman's Ossining school district comparables nor a conclusion about the amount of a proper adjustment that would generally reflect the difference in market perception between the Briarcliff Manor and Ossining school districts. Id.  He testified that

> [i]t's something that I could come up with, but we need period sales analysis, meaning we need to take two almost similar sales, one located at this side of Briarcliff and one on the other side and see the difference in value. But in real life we rarely find that because there's always additional factors that we don't know to contribute towards the school system.

Id. at 37.[14]

To be clear, then, there is no evidence in the record with the exception of the two appraisers' respective conflicting bald assertions, regarding the relative merits of the Briarcliff Manor and Ossining school districts (and neither appraiser is an expert on the quality of school districts, in any event). Nor is there any meaningful evidence, were the Court nonetheless to find that the Briarcliff Manor school district is superior to the Ossining school district, to support any particular market adjustment therefor to Mr. Gluckman's comparables located in the Ossining school district. Mr. Breuer's testimony instead makes it clear that to apply a roughly $80,000 upward adjustment based solely on the pre-adjusted prices of Mr. Gluckman's Ossining school district comparables would be a false correlation.

One may not look past the evidence (or, more aptly, the lack thereof) in the record to apply one's own view of the relative merits of the two school districts, tempting though that may be. Unlike the issue of a market rate broker's fee or market rates for legal services, which the Court hears often, I have never addressed the relative merits or reputations of the Briarcliff Manor and Ossining school districts. Moreover, that would be only the first step in the analysis; more importantly, one would need to discern how such a difference, if it could be reliably determined, affects the market price of properties in the two districts, an issue requiring further expert testimony or, at a minimum, a factual

---

[14] Mr. Breuer also stated that he would not simply exclude a comparable based on it being in a different school district. Id. at 37-38.

11

record that is lacking here. I agree with Mr. Breuer's testimony that such an analysis would not be easy in light of other factors affecting value beyond the simple difference in the quality of school districts. For example, districts with better schools often have higher taxes, yet there is no evidence of the taxes for any of the comparables in the two appraisals as compared to the taxes for the Property. Whether a particular house is attractive to families with children also would need to be taken into account. What remains, then, is a sense that Mr. Gluckman's appraisal might well be low in light of his choice of comparables in a different school district than the Property without, however, the ability to ascribe any particular market value to that possible deficiency.

The second issue raised by the appraisers' testimony is how to adjust for the Property's poor physical condition. The Property is a frame house built in 1940 with a kitchen and bathrooms that do not appear to have been updated since at least the 1990s. If that were the extent of its issues, comparables could be readily found. Both appraisers recognize, however, that the Property also has serious physical problems that complicate its valuation. Mr. Gluckman's appraisal categorizes the condition of the Property as "below average" and notes "asbestos and dampness in the basement [and] recommends the removal of the asbestos and the repair of the foundation be performed by qualified professionals." Gluckman App. at 2. The addendum to his appraisal adds,

> The subject has an addition in the front which consists of a foyer, closet and family room which is in the middle of being renovated and is 40% complete. The central air conditioning does not work and needs to be replaced. The roof on the garage needs to be replaced. The appraiser observed deterioration of the roof. The subject is missing gutters. The appraiser observed in the basement that the pipes are wrapped in asbestos and the foundation showed signs of dampness. The estimated cost to cure all of the issues and repairs is $118,400.

Id. at 11.[15] Mr. Gluckman testified that some of this work is needed to make the Property "habitable," at least that he "personally would not live there." Tr. at 10.

---

[15] Mr. Gluckman noted that he is not a contractor or construction expert and that he based his estimate on consultation with a contractor. Tr. at 8-10.

Mr. Hiney, the Chief Estimator for Nasco Construction Services, offered as his direct testimony an estimate of proposed repairs and renovations to the Property "based on typical construction costs" aggregating $205,600 (the "Nasco Estimate"). Tr. at 19. In addition to the work identified by Mr. Gluckman's appraisal, the Nasco Estimate identifies (a) additional waterproofing, (b) replacing rotten deck, stairs, railings and lattice at the rear of the Property, (c) replacing certain windows and doors, (d) replacing "heaved driveway," (e) installing new attic stairs, (f) painting/staining new trim work, ceilings, walls, doors, windows and deck and (g) repairing boiler. Nasco Estimate at 2. PNC did not challenge the Nasco Estimate. All of the work that the Nasco Estimate identifies (which, in addition to the items listed above, includes completing the unfinished construction at the front of the Property, asbestos abatement, roof and gutter work, waterproofing and foundation work identified by Mr. Gluckman) would seem to be warranted if the Property were to be made even reasonably attractive to buyers, particularly those with school-age children. These are basic repairs, and clearly the less than half-completed renovation to the front of the Property would also need to be finished. Like Mr. Gluckman, Mr. Hiney testified that "[t]he fact that there is asbestos identified within the building creates an [un]inhabitable environment, and there were other issues with open walls, open floors, unfinished space that would make it certainly at the least uncomfortable to live in. So I would say at this point [it is] probably not a good place to live." Tr. at 19-20.

Mr. Breuer did not stint in describing the Property's poor physical condition, either; indeed, his comments largely overlapped Mr. Gluckman's, noting the unfinished renovation of the front of the Property and including the need to fix water damage and brick work and perform water and asbestos remediation in the basement, the need to replace the garage roof, and the need to repair the air conditioning system. Breuer App. at 2. He made a $90,000 aggregate adjustment for such construction

13

and repairs to all of his comparables.  Id. at 11.[16]  He also testified that he classified the Property as "C5" because "basically . . . certain components of the structure are in serious need of repair."  Tr. at 30.

As importantly, Mr. Breuer testified that he could not find a comparable house in similar condition:

> [I]n my opinion the house had serious issues and you don't find similar homes.  I mean there are homes that have [a] dated kitchen, blue baths, but not issues of the unfinished, you know, ten percent unfinished of the house, and asbestos, we don't see in residential these days.

Id. at 32.[17]

Consistent with the "as is" nature of a comparable sales approach appraisal, both appraisers did not simply deduct estimated repair and renovation costs from the sales prices of their comparables.  See In re Wright, 460 B.R. at 585.  Rather, they adjusted their comparables' prices based on their assessment of the effect that the Property's physical condition would have in the market.  Tr. at 10, 11-12, 17 (Gluckman), 27 (Breuer).  Mr. Gluckman imposed a $25,000 downward adjustment to comparables in "average" condition and a $50,000 adjustment to comparables in "good" condition.  Gluckman App. at 5; Tr. at 11.  As noted, Mr. Breuer imposed a $90,000 downward adjustment to all of his comparables, Breuer App. at 3, 8; Tr. at 33, which he classified as "C4," or properties described as

> having some minor deferred maintenance and physical deterioration due to normal wear and tear.  The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs.  All major building components have been adequately maintained and are functionally adequate.

Breuer App. at 9.[18]

---

[16] Like Mr. Gluckman, Mr. Breuer noted that he is not a contractor or construction expert, and he consulted with a contractor only about the cost of asbestos removal, Tr. at 26-27.

[17] Mr. Breuer did not consider the Property to be a "tear down," however, that is, one that could be sold only to a developer who would want to tear it down to build another house.  Id. at 36.

[18] The Property's physical condition seems to be worse than Mr. Breuer's C5 designation, which applies to properties with "obvious deferred maintenance and in need of some significant repairs.  Some building components need repairs, rehabilitation, or updating.  The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains usable and functional as a residence," Breuer App. at 9, and

14

Neither appraiser explained how the market actually reflects their analysis of needed repairs and renovations, which are by far the least in sync of the appraisers' respective adjustments, and I question their reliability. Because a prospective purchaser of the Property would have to pay materially more than the appraisers' respective adjustments -- indeed, between approximately 20 to 50 percent of the Property's otherwise adjusted purchase price -- to make basic repairs and complete the pending renovation, not to mention have to incur the delay and disruption caused by such work, I find that Mr. Breuer's $90,000 downward adjustment is insufficient. Supporting this conclusion is the fact that in Mr. Breuer opinion the average marketing time in this area is 190 days, while each appraiser nevertheless assumed a shorter time -- three to six months – to sell the Property, Gluckman App. at 11; Breuer App. at 11, notwithstanding its current off-putting appearance and clear inferiority to the comparables with the exception of Mr. Gluckman's comparable 1, which was in "below average" condition. As observed by Mr. Breuer, the Property's physical condition really makes it *sui generis*, Tr. at 32. Therefore, the appraisers' respective adjustments for the Property's physical condition need not and should not be accepted. Instead, in light of the high cost, delay and inconvenience of completing the unfinished renovation and making basic repairs, the appraisals are too high by at least $20,000.

## Conclusion

In light of the foregoing, even ascribing the value to its location in the Briarcliff Manor school district reflected in Mr. Breuer's all-Briarcliff Manor school district comparables, I find and conclude that the value of the Property is no more than $420,000.

Accordingly, the Motion should be granted.

---

is far from C4 status. The worst property classification, "C6," refers to property with "substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components." Id. Based on all of the testimony, the Property would seem to be a "C5.5," if such a classification existed.

Counsel for the Debtor should submit the Court's standard <u>Pond</u> order to chambers voiding PNC's junior mortgage on the Property.

Dated:  White Plains, New York
August 31, 2015

<u>/s/ Robert D. Drain</u>
United States Bankruptcy Judge
